# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

**No. ACM 39358**

_____

**UNITED STATES**
*Appellee*

**v.**

**Ralph J. HYPPOLITE, II**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

_____

Appeal from the United States Air Force Trial Judiciary

Decided 25 October 2018[1]

_____

*Military Judge:* Charles E. Wiedie, Jr. (arraignment); Joseph S. Imburgia.

*Approved sentence:* Dishonorable discharge, confinement for 7 years, forfeiture of all pay and allowances, and reduction to E-1. Sentence adjudged 8 June 2017 by GCM convened at Kadena Air Base, Japan.

*For Appellant:* William E. Cassara, Esquire (argued); Captain Dustin J. Weisman, USAF.

*For Appellee:* Major J. Ronald Steelman, III, USAF; Captain Michael T. Bunnell (argued), USAF; Mary Ellen Payne, Esquire.

Before HARDING, HUYGEN, and POSCH, *Appellate Military Judges.*

Judge POSCH delivered the opinion of the court, in which Senior Judge HARDING joined.[2] Judge HUYGEN filed a separate opinion concurring in the result in part and dissenting in part.

_____

[1] We heard oral argument in this case on 5 September 2018.

[2] Senior Judge Harding participated in this decision prior to his retirement.

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

_____

POSCH, Judge:

A general court-martial composed of a military judge found Appellant guilty, contrary to his pleas, of three specifications of abusive sexual contact and one specification of sexual assault, all in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920. Appellant was acquitted of one specification of abusive sexual contact. The military judge sentenced Appellant to a dishonorable discharge, confinement for seven years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the adjudged sentence.

Appellant raises five issues on appeal: (1) whether the military judge erred in allowing the Government to use the charged offenses as evidence of a plan or scheme under Mil. R. Evid. 404(b) to prove other charged offenses; (2) whether the evidence is legally and factually sufficient to support the convictions; (3) whether the convening authority improperly referred Specifications 1 and 5 of the Charge alleging sexual misconduct after a preliminary hearing officer (PHO) determined there was no probable cause to believe Appellant committed those offenses; (4) whether the addendum to the staff judge advocate's recommendation (SJAR) failed to adequately address raised legal errors and provided incomplete advice to the convening authority; and (5) whether the military judge erred by admitting messages Appellant sent to Senior Airman (SrA) JD, in which Appellant took "full responsibility for what happened," without also admitting later messages from the conversation, which showed that Appellant believed he and SrA JD both made bad decisions while they were drunk.[3] We also considered the issue of post-trial delay, although it was not raised by Appellant.

We find the evidence is factually insufficient to sustain the conviction of abusive sexual contact of Staff Sergeant (SSgt) RW in Specification 1 of the Charge. We thus set aside the finding of guilt for Specification 1 and reassess the sentence. We also find the military judge erred in ruling that evidence of a common plan or scheme under Mil. R. Evid. 404(b) was relevant and probative for all specifications but conclude the error was harmless. Finding no further error, we affirm the remaining convictions and sentence as reassessed.

_____

[3] Appellant personally asserts issues (4) and (5). *See United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

## I. BACKGROUND

The five charged offenses span a two-year period when Appellant and the alleged victims were assigned to the same unit at Seymour Johnson Air Force Base, North Carolina. The allegations involve three Airmen and a former Airman, SSgt RW, SSgt SAK, Mr. STK, and SrA JD, who all testified at Appellant's court-martial.[4] In Specifications 1–3, Appellant was alleged to have committed abusive sexual contact by touching the genitalia of SSgt RW, SSgt SAK, and Mr. STK, respectively, either directly or through their clothing, while each was asleep, with an intent to gratify Appellant's sexual desire. In Specification 4, Appellant was alleged to have committed abusive sexual contact by causing bodily harm by touching SrA JD's genitalia with an intent to gratify Appellant's sexual desire. In Specification 5, Appellant was alleged to have sexually assaulted SrA JD by penetrating his mouth and anus with Appellant's penis.

The military judge applied Mil. R. Evid. 404(b) to find a common plan or scheme and ruled that evidence of each offense alleged in Specifications 1–3 was relevant and probative as to Specifications 4 and 5 and vice versa. The military judge convicted Appellant of abusive sexual contact of SSgt RW, Mr. STK, and SrA JD (Specifications 1, 3, and 4, respectively) and of sexual assault of SrA JD (Specification 5). Appellant was acquitted of abusive sexual contact of SSgt SAK (Specification 2). At trial, the parties presented evidence as described below.

## A. Evidence of Abusive Sexual Contact of SSgt RW, SSgt SAK, and Mr. STK (Specifications 1–3)

### 1. SSgt RW

SSgt RW and Appellant became friends in technical training and worked together in the same unit at Seymour Johnson Air Force Base. They remained friends and were housemates from the fall of 2011 until SSgt RW moved out just before Appellant transferred to a new duty assignment in 2014. In August 2012, Appellant, SSgt RW and other Airmen were on a temporary duty (TDY) assignment to Mountain Home Air Force Base, Idaho, and were billeted on base in individual rooms. One evening Appellant, SSgt RW, and others visited a bar to celebrate SSgt RW's birthday and consumed alco-

---

[4] For consistency, we refer to the Airmen by their grade on the charge sheet and when they testified. At the time of the respective alleged offenses, SSgt RW and SSgt SAK were Senior Airmen (E–4), Mr. STK was an Airman First Class (E–3), and SrA JD was an Airman (E–2).

hol. Around 0200, the group, including Appellant and SSgt RW, returned to lodging. SSgt RW went to bed in his own room wearing only boxer-brief underwear.

After falling asleep, SSgt RW woke from a "very, oddly realistic" dream about having sexual intercourse with a woman. He testified that during the dream he "felt weight" on his body, and "[i]t actually felt like [he] was having intercourse." Then, "when it just seemed too real and [he] woke up from [his] sleep," he called out, "who's there?" unsure if someone else was in his room or not. After a moment of silence, SSgt RW felt movement at the foot of the bed and observed a figure run out of the room. SSgt RW sprang out of bed and gave chase. He pulled up his underwear as he pursued because the waist band of his briefs covered only the bottom half of his genitalia. His penis was partially exposed but still tucked under the waistband of his briefs. In the light of the hallway, SSgt RW observed Appellant, wearing only underwear, go into Appellant's room.

SSgt RW returned to his room to go back to bed and noticed his penis was "wet." He was confused, "didn't know what to think," and "didn't know if anything was even real at that point." SSgt RW testified he texted a coworker and relayed some of what happened to him, except he told her that the dream involved him and Appellant having sex. The coworker testified that SSgt RW knocked on her door after everyone had returned to lodging from the bar, and he looked like he had seen a ghost. He appeared panicked, out of breath, pale, "clammy looking," and sweaty, and he repeated over and over that "[Appellant] was in my room." SSgt RW testified he was terrified but convinced himself that the incident was a dream, that nothing had happened with Appellant, and that the wetness he felt was his own sweat.

SSgt RW remained housemates with Appellant for at least 16 months after the incident and nothing similar happened to him again. SSgt RW continued to believe the incident in his billeting room was a dream. That belief changed in December 2013 or early 2014 when SSgt RW learned of an incident involving Appellant and another housemate. Consequently, SSgt RW led an "intervention" with at least three other Airmen, including SSgt SAK and Mr. STK, to confront Appellant about his behavior. Speaking for the group, SSgt RW told Appellant that they knew what he had been doing to them when they were sleeping or after they had been drinking and that he needed to stop. None of the Airmen went into detail about what each believed Appellant had done. Appellant appeared nervous and responded, "I know it's a problem . . . it's caused by when I drink," or words to that effect, but did not admit to specifics of any particular incident. They told Appellant they would report him if it happened again. Even though they tried to stay friends with

Appellant, Appellant started to avoid them and soon thereafter SSgt RW moved out of the house.

The military judge convicted Appellant of abusive sexual contact of SSgt RW as charged in Specification 1.

### 2. SSgt SAK

SSgt SAK testified that he knew Appellant from technical training and work and was once housemates and close friends with Appellant. Outside of work SSgt SAK and a group of friends that included Appellant and SSgt RW spent time together at house parties, bars, movies, and the like. After he had moved out of the house, in October 2013, he and Appellant went to a bar, drank alcohol, and returned to Appellant's house. SSgt SAK fell asleep on a couch and awoke three hours later to find his pants' zipper undone and his penis and testicles fully exposed through the opening in his underwear. SSgt SAK testified that Appellant's housemates were absent and he was alone with Appellant. SSgt SAK had no recollection of Appellant touching his genitalia. He did not think at the time that Appellant had done anything untoward until about January 2014 when SSgt RW related his own incident with Appellant when the two were TDY.

The military judge acquitted Appellant of abusive sexual contact of SSgt SAK as charged in Specification 2.

### 3. Mr. STK

Mr. STK described Appellant as a best friend and coworker. He was considered the "extra roommate" because two or three times a week he was at Appellant's house. Their off-duty time together included going to bars and riding motorcycles on weekends. Sometime in 2013 or early 2014, Mr. STK and Appellant completed their shifts and went to Appellant's house. Both drank alcohol and no one else was present. Mr. STK consumed several beers and, although not intoxicated, fell asleep on the couch wearing his Airman Battle Uniform (ABU). As he slept on his back, Mr. STK woke up feeling someone touch his groin near his penis and reach for his belt. He observed a hand reaching over the back of the couch and touching his genitalia over his ABU at least five times, and each time Mr. STK swatted at the hand. Finally, Mr. STK stood up and asked Appellant, who was behind the couch, "What are you doing?" Mr. STK observed Appellant crouched over, face down as if Appellant were "trying to hide," and then Appellant "scurried" away.

The military judge convicted Appellant of abusive sexual contact of Mr. STK as charged in Specification 3.

**B. Evidence of Abusive Sexual Contact and Sexual Assault of SrA JD (Specifications 4 and 5)**

SrA JD, who was then an E–2, met Appellant in June 2014, soon after SrA JD had graduated from technical training and was assigned to Appellant's unit. SrA JD thought of Appellant, an E–5, as an "acquaintance." In August 2014, SrA JD accepted an invitation to a party at Appellant's house along with six to eight other Airmen from the unit. Appellant served alcoholic beverages, including to SrA JD who had at least three or four mixed drinks. Early in the evening, SrA JD "was feeling quite intoxicated" to the point that he was slurring words and bumping into things. SrA JD told Appellant he "felt really drunk" and was concerned about where he was going to sleep. Appellant offered him Appellant's bed, and he went to Appellant's bedroom, closed the door, lay on top of the bedding with his clothes on, and quickly fell asleep.

SrA JD testified that he woke to the sound of the door opening and Appellant entering the bedroom. As Appellant got on the bed to lie down, SrA JD felt awkward because he thought Appellant would sleep somewhere else. However, SrA JD knew there was plenty of room for them both, compared sharing the bed with Appellant to military members showering together in Basic Military Training, and was not going to "kick [Appellant] out of his own bed." Appellant rolled to face SrA JD and asked SrA JD "if [he]'d ever wanted to experiment with guys, or if [he]'d ever thought about messing around with other guys." Still feeling the effects of alcohol, including a headache and nausea, SrA JD responded, "no, man. I just want to go to sleep." As SrA JD lay on his back, Appellant reached out and grabbed SrA JD's penis over his shorts and began to massage it. Meanwhile, Appellant asked SrA JD, "you've never thought about it before?" and "are you sure?" Three or four times, SrA JD told Appellant variously "no, man" and that he just wanted to sleep. Appellant persisted in touching SrA JD's genitalia through his clothing and trying to change his mind. SrA JD testified that Appellant's conduct in touching his genitalia was the first time a male had ever done something like that to him.

The next thing SrA JD recalled was being naked with his feet towards the head of the bed, his head positioned over Appellant's groin, and Appellant moving Appellant's penis into and out of SrA JD's mouth. SrA JD testified that he did not recall his precise position or how he got into that position and felt "disassociated" from what was happening. SrA JD felt a "dullness of senses" and the same effects of intoxication from alcohol that he felt when Appellant was rubbing his penis. SrA JD testified that he remembered tasting lotion and noticed Appellant was naked at least from the neck to the knees, and he did not try to stop Appellant. He remembered Appellant "grabbed" and "kind of pushed and moved" him to a "chest-to-chest" position

so that SrA JD was on top of Appellant. SrA JD did not resist because, according to his testimony, he "disassociated" from what was happening to him physically. Appellant then pushed his penis into SrA JD's anus. SrA JD testified the penetration was very painful and he felt fear. He winced and may have made a vocal expression of pain. Appellant stopped said he would finish on his own and began to masturbate. SrA JD faced away from Appellant and fell asleep. Later, SrA JD awoke, dressed, left Appellant asleep in the bed, and laid awake on a couch in the living room for a couple hours. SrA JD testified that he had a "very severe headache and very bad nausea" as well as soreness on his anus. He did not leave immediately because he thought he might still be intoxicated. It did not occur to him to call someone to pick him up and he just wanted to go back to sleep. When asked how he knew the sexual acts were nonconsensual, SrA JD testified that he would not have engaged in the acts had he been sober and that he did not feel like he had consented at the time.

That morning SrA JD told his girlfriend what had happened. He did not report the incident to law enforcement because the thought of having the "spotlight" on him, being an E–2 and new to the Air Force, was an "incredibly terrifying thought." About one month after the incident, among other attempts to contact SrA JD, Appellant sent SrA JD a message stating Appellant took "full responsibility for what happened that night. We were drunk and one thing lead [sic] to another." In 2016, SrA JD reported the assault after he learned he was to be transferred to a new base and assigned to the same unit as Appellant.

The military judge convicted Appellant of abusive sexual contact and sexual assault of SrA JD as charged in Specifications 4 and 5.

## II. DISCUSSION

Appellant submitted five assignments of error. We separately address four of these issues[5] and post-trial delay below.

---

[5] Appellant's fourth assignment of error alleging defects in the post-trial processing of his case is resolved by our assessment of the impact of the military judge's error in the Mil. R. Evid. 404(b) ruling. While we agree with Appellant that the SJAR addendum incorrectly assessed the legal error in the use of Mil. R. Evid. 404(b) in his case, we find no prejudicial error because the SJAR addendum was legally sufficient. Rule for Courts-Martial 1106(d)(4). Thus, we have considered and reject this claim, which neither requires additional analysis nor warrants relief. *See United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987).

**A. Mil. R. Evid. 404(b) Evidence**

Before trial, the Defense moved to sever Specifications 1–3 from Specifications 4 and 5, as the latter specifications dealt with a different victim. The Government argued, as a reason the motion to sever should be denied, that Appellant's conduct admitted to prove each charged offense could properly be used under Mil. R. Evid. 404(b) as evidence that Appellant had a pattern or common plan of engaging in sexual conduct with his friends after they had been drinking and were asleep or trying to fall asleep.

The crux of Appellant's position throughout trial and on appeal is that the sexual conduct alleged in each specification was separate and distinct and must stand on its own. Appellant contends that the allegations were not sufficiently similar to show a common plan and that allowing evidence of one charged offense as evidence of a separate charged offense was tantamount to allowing the factfinder to consider evidence of Appellant's propensity to engage in sexual misconduct. Appellant, citing *United States v. Hukill*, 76 M.J. 219 (C.A.A.F. 2017), and *United States v. Hills*, 75 M.J. 350 (C.A.A.F 2016), renews on appeal his claim that the military judge misapplied Mil. R. Evid. 404(b) and Mil. R. Evid. 403 and improperly allowed charged offenses to be used as propensity evidence to prove other charged offenses.[6]

**1. Military Judge's Ruling**

The military judge who presided on the motion agreed with the Government and denied the Defense motion to sever.[7] To resolve the severance motion, the military judge determined that evidence admitted to prove Specifications 1–3 was probative as to Specifications 4 and 5 and vice versa. The military judge applied the three-pronged test articulated in *United States v. Reynolds*, 29 M.J. 105 (C.M.A. 1989), to find that Mil. R. Evid. 404(b) allowed the evidence of one charged offense to be used to prove another.

In *Reynolds*, the Court of Military Appeals, the predecessor to the United States Court of Appeals for the Armed Forces (CAAF), established a three-pronged test for the admission of evidence under Mil. R. Evid. 404(b): (1) Does the evidence reasonably support a finding by the factfinder that Appel-

---

[6] In *Hukill*, 76 M.J. at 222, and *Hills*, 75 M.J. at 355–56, the United States Court of Appeals for the Armed Forces (CAAF) held that the use of evidence of charged conduct as Mil. R. Evid. 413 propensity evidence for other charged conduct in the same case is error, regardless of the forum, the number of victims, or any connection between the events.

[7] Appellant does not challenge the severance ruling on appeal.

lant committed other crimes, wrongs, or acts? (2) Does the evidence of the other act make a fact of consequence to the instant offense more or less probable? (3) Is the probative value of the evidence of the other act substantially outweighed by the danger of unfair prejudice under Mil. R. Evid. 403? 29 M.J. at 109 (citations omitted). "If the evidence fails to meet any one of these three standards, it is inadmissible." *Id*.

Applying the first *Reynolds* prong, the military judge found that a reasonable member could find by a preponderance of evidence that Appellant engaged in the conduct alleged in each charged specification. As to the second prong, the military judge agreed with the Government that the evidence could be used for a purpose other than to show propensity. The military judge explained:

> In this case, the common factors were the relationship of the alleged victims to the accused (friends), the circumstances surrounding the alleged commission of the offenses (after a night of drinking when the alleged victim was asleep or falling asleep), and the nature of the misconduct (touching the alleged victims' genitalia). The nature of the misconduct alleged in Specification 5 is different than the other allegations but is alleged to have occurred in connection with the alleged touching of SrA [JD]'s genitalia. This court finds that each specification is relevant and probative as to the other specifications regarding the accused's common plan to engage in sexual conduct with his friends after they have been drinking and were asleep or falling asleep.

The military judge applied the third *Reynolds* prong and concluded the probative value of the common-plan evidence was not substantially outweighed by the danger of unfair prejudice, such as the risk of confusion of the issues, misleading the members, or any other factor listed in Mil. R. Evid. 403.

Appellant elected trial by military judge alone.[8] After the presentation of evidence, the military judge who presided at trial held the testimony at trial was similar to the evidence on the motion to sever and, citing Rule for Courts-Martial (R.C.M.) 801(e)(1)(A), did not disturb the motions judge's Mil. R. Evid. 404(b) ruling except to find a "scheme" instead of a "common plan."

---

[8] A change of military judge occurred after the ruling on the severance motion.

### 2. Law

Mil. R. Evid. 404(b) provides that evidence of a crime, wrong, or other act by a person is not admissible as evidence of the person's character in order to show the person acted in conformity with that character on a particular occasion. It cannot be used to show predisposition toward crime or criminal character; however, such evidence may be admissible for another purpose, including, *inter alia*, proving intent or plan. Mil. R. Evid. 404(b); *United States v. Staton*, 69 M.J. 228, 230 (C.A.A.F. 2010).

The three-pronged test for determining the admissibility of evidence under Mil. R. Evid. 404(b) is set forth in *Reynolds*, *supra*. The CAAF has applied *Reynolds* when the Government seeks to use evidence of charged misconduct for a Mil. R. Evid. 404(b) purpose to prove another charged offense. *See United States v. Tanksley*, 54 M.J. 169, 176 (C.A.A.F. 2000) (*overruled in part on other grounds by United States v. Inong*, 58 M.J. 460, 465 (C.A.A.F. 2003)). Consequently, we conclude that the *Reynolds* test for *admissibility* of uncharged acts is instructive to determine *use* of facts underlying one charged offense to prove a different charged offense.

A military judge's ruling under Mil. R. Evid. 404(b) and Mil. R. Evid. 403 will not be disturbed except for a clear abuse of discretion. *United States v. Morrison*, 52 M.J. 117, 122 (C.A.A.F. 1999) (citation omitted). In analyzing discrete acts for evidence of a "plan," we consider whether the "charged act is an additional manifestation, or whether the acts merely share some common elements." *United States v. McDonald*, 59 M.J. 426, 430 (C.A.A.F. 2004) (citations omitted). Evidence of other acts "'must be almost identical to the charged acts' to be admissible as evidence of a plan or scheme." *Morrison*, 52 M.J. at 122 (quoting *United States v. Brannan*, 18 M.J. 181, 183 (C.M.A. 1984)). The standard for a "scheme" is "significantly similar conduct." *Reynolds*, 29 M.J. at 110. In contrast, to be used as evidence of intent, the "other wrongs or acts need only be similar to the offense charged and not too remote therefrom." *United States v. Woodyard*, 16 M.J. 715, 718 (A.F.C.M.R. 1983) (footnote omitted) (citing *United States v. Goodwin*, 492 F.2d 1141, 1153 (5th Cir. 1974)).

"A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)). In reviewing the military judge's decision to admit evidence, "we consider the evidence 'in the light most favorable to the' prevailing party." *United States v. Rodriguez*, 60 M.J. 239, 246−47 (C.A.A.F. 2004) (citation omitted).

### 3. Analysis

We agree with the military judge's ruling on the first *Reynolds* prong. A reasonable factfinder could find by a preponderance of evidence that Appellant engaged in or attempted the conduct alleged in each of the five charged specifications.

As to the second *Reynolds* prong, a fact of consequence for Specifications 1–3 was whether Appellant engaged in a plan or scheme to touch the genitalia of friends in a way that evaded their notice or attention after they had been drinking and were asleep. The separate evidence of Specifications 1, 2, and 3 made this fact more probable than not for each offense charged in Specifications 1, 2, and 3. Appellant's furtive conduct in Specifications 1–3 was nearly identical and, therefore, could properly be used as evidence of a plan or scheme common to Specifications 1–3. A second fact of consequence for Specifications 1–3 was Appellant's intent to gratify his sexual desire. Though not articulated by the military judge, we find that the separate evidence of Specifications 1, 2, and 3 made this fact more probable than not for each offense charged in Specifications 1, 2, and 3 because it showed Appellant's intent to gratify his sexual desire as opposed to an intent to joke. The acts in Specifications 1–3 are significantly alike, are not too remote, and support an inference of Appellant's intent to gratify his sexual desire. Thus, Appellant's plan or scheme to touch the genitalia of friends after they had been drinking and were asleep and specific intent to gratify Appellant's sexual desire are facts of consequence for Specifications 1–3 made more probable by the evidence of Specifications 1–3.

As to the third *Reynolds* prong, the military judge properly applied the Mil. R. Evid. 403 balancing test. The probative value of the evidence was not substantially outweighed by the danger of unfair prejudice to determine Appellant's guilt of Specifications 1–3.

We find, however, that the military judge erred in concluding that evidence of sexual contact supporting Specifications 1–3 made more probable a fact of consequence for Specifications 4 and 5 and vice versa. In Specifications 1–3, Appellant acted secretively while his friends slept, whereas, in Specifications 4 and 5, Appellant initiated sexual contact with SrA JD while SrA JD was awake and aware of Appellant's presence and Appellant communicated Appellant's desire to engage in sexual activity with SrA JD. The common factors between Specifications 1–3 and Specifications 4–5 were that Appellant attempted sexual activity with a male Airman after the Airman had been drinking and lain down to sleep. Considering that Appellant lived in a house with several male Airmen and regularly socialized and drank alcohol with these and other male Airmen, we find the acts charged as Specifications 1–3

and the acts charged as Specifications 4–5 shared some common factors but were insufficiently similar to prove a common plan or scheme.[9]

Therefore, we find that evidence of sexual contact supporting Specifications 1–3 did not make a fact of consequence for the sexual contact charged in Specification 4 and the sexual act charged in Specification 5 more probable and vice versa. Accordingly, we conclude that the military judge's application of the second *Reynolds* prong to the evidence of each of the five specifications as a plan or scheme common to all five specifications was clearly unreasonable and therefore constituted a clear abuse of discretion. We address the impact of our finding in our test for prejudice below.

**B. Factual and Legal Sufficiency**

Appellant challenges the legal and factual sufficiency of the four findings of guilty. We review issues of legal and factual sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted). Though we "cannot find as fact any allegations of which [an appellant] was found not guilty at trial," we "may consider facts underlying an acquitted charge in considering whether the facts support a separate charge." *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *Rosario*, 76 M.J. at 117 (C.A.A.F. 2017)).

---

[9] The Government urges us to consider that "each specification involved Appellant taking advantage of his friends when they were asleep or almost asleep after drinking alcohol." Indeed, there is commonality in relationship (Airmen who were assigned to the same unit and sometimes worked together), ages of victims (young adult males), circumstances of the acts (nighttime sexual activity after drinking alcohol and sleeping or falling asleep in the same general location as Appellant), and the sexual nature of the acts. However, we caution that many incidents share these common factors but do not result in sexual abuse or assault. And, on these facts, we cannot conclude that the factors were sufficiently distinctive to establish a common plan or scheme under Mil. R. Evid. 404(b) and Mil. R. Evid. 403—particularly when the charged acts themselves were infrequent and the "common" factors were enduring (e.g., friendship) and recurring (e.g., drinking alcohol) over a prolonged period of time (e.g., as long as two years).

"For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399. While we must find that the evidence was sufficient beyond a reasonable doubt, it "does not mean that the evidence must be free of conflict." *United States v. Galchick*, 52 M.J. 815, 818 (A.F. Ct. Crim. App. 2000) (citation omitted).

### 1. Specification 1—Abusive Sexual Contact of SSgt RW

We are not convinced that the evidence of Specification 1 was sufficient beyond a reasonable doubt and find Appellant's conviction factually insufficient. In order for the military judge to find Appellant guilty of abusive sexual contact of SSgt RW, as charged in Specification 1, the Government was required to prove beyond a reasonable doubt four elements: (1) Appellant committed sexual contact upon SSgt RW by touching SSgt RW's genitalia; (2) SSgt RW was asleep; (3) Appellant knew or reasonably should have known that SSgt RW was asleep; and (4) Appellant touched SSgt RW's genitalia with the intent to gratify Appellant's sexual desire. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM),* pt. IV, ¶ 45.b.(7)(e). The term "sexual contact" allows that "[t]ouching may be accomplished by any part of the body." Article 120, UCMJ, 10 U.S.C. § 920(g)(2)(B).

Even accepting the truth of SSgt RW's recollection and testimony and considering the evidence of Specifications 2 and 3 as a common plan or scheme under Mil. R. Evid. 404(b), we are not convinced beyond a reasonable doubt that Appellant committed an abusive sexual contact offense against SSgt RW. Immediately after his late-night interaction with Appellant, SSgt RW was confused, "didn't know what to think," and "didn't know if anything was even real at that point." For about 16 months he believed that he had only experienced a very realistic dream and that his penis was wet from his own sweat and not attributable to sexual contact by Appellant.

On this record, we find reasonable doubt whether Appellant touched SSgt RW—much less made sexual contact—while SSgt RW slept. However realistic the erotic dream may have seemed to SSgt RW at the time, it is insufficient proof of sexual contact of SSgt RW's genitalia by any part of Appellant's body. We also do not agree with the Government's claim that sexual contact was proven beyond a reasonable doubt because SSgt RW woke to find his underwear partially covered his genitalia or because, sometime after giving

chase to Appellant, SSgt RW discovered that his penis was wet. A coworker's testimony corroborated that SSgt RW was sweating and he looked "clammy" immediately after the incident. We give greater weight to this circumstantial evidence that SSgt RW's penis was wet because he was sweating than circumstantial evidence that Appellant touched SSgt RW's penis and somehow made it wet because Appellant was present at the foot of the bed.

At trial, the Government relied on Appellant's guilty conscience—shown by Appellant bolting out of SSgt RW's room when discovered and Appellant's admission when confronted that he had a "problem"—and pattern of engaging in sexual conduct with male friends after they had been drinking and were asleep or falling asleep as evidenced by Appellant's common plan or scheme. We agree these facts tend to show that Appellant was present in SSgt RW's room with the intent to gratify Appellant's sexual desire. However, the evidence as a whole does not persuade us beyond a reasonable doubt that Appellant touched SSgt RW's genitalia and engaged in sexual contact.

After weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are not convinced beyond a reasonable doubt of Appellant's guilt of the offense against SSgt RW. We therefore find the evidence factually insufficient[10] to support the finding of guilty for Specification 1. We address the impact of our finding and reassess Appellant's sentence below.

This finding of factual insufficiency does not end our analysis of Specification 1. We "may approve or affirm . . . so much of the finding as includes a lesser included offense." Article 59(b), UCMJ, 10 U.S.C. § 859(b). We "may not affirm an included offense on 'a theory not presented to the' trier of fact." *United States v. Riley*, 50 M.J. 410, 415 (C.A.A.F. 1999) (citation omitted) (quoting *Chiarella v. United States*, 445 U.S. 222, 236 (1980)). "To do so 'offends the most basic notions of due process,' because it violates an [appellant's] 'right to be heard on the specific charges of which he [or she] is accused.'" *Id.* (second alteration in original) (quoting *Dunn v. United States*, 442 U.S. 100, 106 (1979)).

Before findings argument, the Government maintained there was no lesser-included offense (LIO) of Specification 1. The military judge asked the Defense and the Defense agreed. Even if we were convinced beyond a reasonable doubt that Appellant is guilty of attempted abusive sexual contact of SSgt

---

[10] Because we find the evidence factually insufficient, we do not address legal sufficiency.

RW, this theory was disclaimed by the Government at the close of its case, and it was not presented to the military judge as the trier of fact. Accordingly, we may not affirm a conviction on the LIO of attempted abusive sexual contact.

### 2. Specification 3—Abusive Sexual Contact of Mr. STK

In order for the military judge to find Appellant guilty of abusive sexual contact of Mr. STK, as charged in Specification 3, the Government was required to prove beyond a reasonable doubt the same four elements of abusive sexual contact as charged in Specification 1. However, unlike in Specification 1, in Specification 3 the Government charged Appellant with touching "through the clothing" the genitalia of Mr. STK. Appellant argued at trial and again on appeal that proof Appellant acted with the intent to gratify his sexual desire is lacking. Mr. STK testified that it was not uncommon for members of the unit to flick each other's genitalia as a joke, or what was called a "ball tap." The Defense characterized Appellant's actions on the night in question as such a joke. We are not persuaded.

The touching charged in Specification 3 was very different from the joke Mr. STK described in that Appellant's hand stayed on Mr. STK's genitalia for longer than a mere flick and the contact occurred when Mr. STK was asleep. Because of Appellant's repeated groping of Mr. STK, his hiding behind the couch and then fleeing when confronted by Mr. STK, and his general admission to his friends that he knew he had a "problem" that happened when he had been drinking, we agree with the Government that Appellant's contact with Mr. STK's genitalia on the night in question was motivated by an intent to gratify Appellant's sexual desire and was not meant as a joke. Additionally, evidence supporting Specifications 1 and 2 could properly be used under Mil. R. Evid. 404(b) as a plan or scheme to prove that the sexual contact charged in Specification 3 occurred and that it was intended to gratify Appellant's sexual desire.[11]

Considering the evidence in the light most favorable to the prosecution, we find that a rational factfinder could have found Appellant guilty beyond a reasonable doubt of all the elements of Specification 3. Furthermore, we our-

---

[11] Though we find Appellant's conviction of sexual misconduct of SSgt RW factually insufficient and Appellant was acquitted of sexual misconduct of SSgt SAK, the facts underlying these allegations are nevertheless permissible for appellate review. *See United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017).

selves are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's conviction both legally and factually sufficient.

### 3. Specification 4—Abusive Sexual Contact of SrA JD

Appellant renews the argument he made at trial that the Government failed to prove beyond a reasonable doubt that SrA JD did not consent to Appellant touching SrA JD's genitalia and that, even if SrA JD did not consent, it was reasonable for Appellant to have had a mistaken belief that SrA JD did consent. We disagree.

As charged in Specification 4, the Government had to prove beyond a reasonable doubt the following three elements: (1) Appellant committed sexual contact upon SrA JD by touching SrA JD's genitalia;[12] (2) Appellant caused bodily harm to SrA JD by touching SrA JD's genitalia; and (3) Appellant did so with the intent to gratify his own sexual desire. *See MCM,* pt. IV, ¶ 45.b.(7)(b). "The term 'bodily harm' means any offensive touching of another, however slight, including any . . . nonconsensual sexual contact." Article 120, UCMJ, 10 U.S.C. § 920(g)(3).

With regard to consent, the statute provides, "'[C]onsent' means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance or submission resulting from the [appellant]'s use of force . . . does not constitute consent." *Id.* § 920(g)(8)(A). "Lack of consent may be inferred based on the circumstances of the offense. All the surrounding circumstances are to be considered in determining whether a person gave consent, or whether a person did not resist or ceased to resist only because of another person's actions." *Id.* § 920(g)(8)(C).

Before and after Appellant initiated sexual contact, SrA JD repeatedly told Appellant "no, man." His words were plain, unambiguous and coherent and more than adequately manifested lack of consent:

> Q [Trial Counsel]. Did you say anything that would convey to [Appellant] that that was something that you wanted?
>
> A [SrA JD]. No, not at all.

---

[12] The evidence at trial established that Appellant touched, *through the clothing*, the genitalia of SrA JD. We find this variance from the specification was not material and did not substantially change the nature of the offense, increase the seriousness of the offense, or increase the punishment. *See United States v. Marshall*, 67 M.J. 418, 420 (C.A.A.F. 2009).

Q. Did you say that loud enough that [Appellant] would have been able to hear it?

A. Absolutely.

Q. How many times do you think that you said no, or stop or some variation thereof?

A. At least three or four times.

Q. Did [Appellant] stop?

A. No, he continued.

Q. And had you said stop or no, I want to go to sleep before [Appellant] touched you as well?

A. Yes.

Q. And you said that [Appellant] touched you where at that point?

A. On my penis, on top of my shorts . . . [he] didn't place his hands underneath my pants, but over my pants and he began to massage my penis.

Q. Is that something you wanted?

A. No, ma'am.

Knowing full well that SrA JD had gone to bed because of the amount of alcohol he had consumed and because he was tired, Appellant was on notice that SrA JD's words and inaction unequivocally conveyed that all he wanted to do was sleep. SrA JD's verbal protestations and—under these circumstances—his lack of physical resistance demonstrate and are consistent with a lack of consent.

If shown by some evidence, mistake of fact as to consent is a defense to abusive sexual contact. It requires that an appellant, due to ignorance or mistake, incorrectly believed that another consented to the sexual contact. To be a viable defense, the mistake of fact must have been honest and reasonable under all the circumstances. *See* R.C.M. 916(j)(1). To be persuaded by Appellant's argument that he was mistaken, we would have to discount evidence that Appellant initiated sexual contact with SrA JD and that Appellant continued to touch SrA JD in spite of his protests. On these facts we find the Government proved Appellant was not reasonably mistaken as to consent.

Viewing the evidence in the light most favorable to the prosecution, we find that a rational factfinder could have found Appellant guilty beyond a reasonable doubt of all the elements of Specification 4. Furthermore, we ourselves are convinced of Appellant's guilt beyond a reasonable doubt. Specifi-

cally, we find there was proof beyond a reasonable doubt that Appellant committed sexual contact upon SrA JD by touching his genitalia through his clothing, without SrA JD's consent, and with the intent to gratify Appellant's sexual desire. Therefore, we find Appellant's conviction both legally and factually sufficient.

### 4. Specification 5—Sexual Assault of SrA JD

The military judge also convicted Appellant of sexual assault of SrA JD. As charged in Specification 5, the Government had to prove beyond a reasonable doubt the following elements: (1) Appellant committed a sexual act upon SrA JD by causing penetration, however slight, of SrA JD's mouth and anus with Appellant's penis; and (2) Appellant caused bodily harm to SrA JD by penetrating SrA JD's mouth and anus with Appellant's penis. *See MCM,* pt. IV, ¶ 45.b.(3)(b). "The term 'bodily harm' means any offensive touching of another, however slight, including any nonconsensual sexual act . . . ." Article 120, UCMJ, 10 U.S.C. § 920(g)(3). "Lack of consent" is defined by statute the same as it was in our analysis of Specification 4.

As with Specification 4, Appellant renews the argument he made at trial that the Government failed to prove beyond a reasonable doubt that SrA JD did not consent to the sexual acts and that, even if SrA JD did not consent, it was reasonable for Appellant to have had a mistaken belief that SrA JD did consent. Viewing the sexual assault offense in isolation from Appellant's abusive sexual contact of SrA JD that preceded this allegation, we might agree. However, the sexual act alleged in Specification 5 followed Appellant's non-consensual sexual contact with SrA JD that was charged in Specification 4. Appellant's conduct with SrA JD, charged as two discrete offenses, nevertheless occurred as a continuous course of conduct with a single criminal objective. Thus, we find the two offenses are factually intertwined and the circumstances that underlie Appellant's non-consent to the abusive sexual contact in Specification 4 are relevant here.

SrA JD was a very junior Airman and did not know Appellant well either socially or professionally. On the night of the assault, Appellant knew that SrA JD was tired, drunk, and—as evident by Appellant's query if SrA JD had "ever wanted to experiment" or had "ever thought about" messing around with other men—uninitiated in male-on-male sexual acts. Appellant's repeated propositioning of SrA JD verbally and, at the same time, physically was unwelcome, and his prodding was matched by SrA JD's repeated protests to just allow him to sleep. It is in this context that we consider evidence that SrA JD "disassociated" and did not further resist oral and anal penetration by Appellant and that SrA JD's memory or recall of the incident was far from complete. On these facts, Appellant as the initiator to the conduct that began in Specification 4 turned a deaf ear to SrA JD's repeated manifestations of

non-consent and, we find, could not have held a reasonably mistaken belief that SrA JD consented to the sexual acts of Specification 5. Considering all the surrounding circumstances in a light most favorable to the prosecution, to include Appellant's statement taking full responsibility for his conduct with SrA JD, we find that a reasonable factfinder could have found that SrA JD ceased resisting because of Appellant's actions and that there was no "freely given agreement to the conduct at issue." Article 120, UCMJ, 10 U.S.C. § 920(g)(8)(A). We conclude that the Government proved beyond a reasonable doubt that SrA JD did not consent to Appellant's oral and anal penetration of SrA JD and that it was not reasonable for Appellant to believe that SrA JD had consented.

Considering the evidence in the light most favorable to the prosecution, we find that a rational factfinder could have found Appellant guilty beyond a reasonable doubt of all the elements of Specification 5. Furthermore, we ourselves are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's conviction both legally and factually sufficient.

**C. Harmless Error**

Finding error in the Mil. R. Evid. 404(b) ruling allowing use of the evidence underlying Specifications 1–3 to prove Specifications 4–5 and vice versa, we address the impact of our finding and test for prejudice. When there is nonconstitutional[13] error in the admission of evidence, including under Mil. R. Evid. 404(b), we ask whether the evidence had a "substantial influence on the [military judge's] verdict in the context of the entire case." *See United States v. Harrow*, 65 M.J. 190, 200 (C.A.A.F. 2007) (citations omitted). "We consider four factors: (1) the strength of the government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question." *Id.* (citation omitted). "An error is more likely to be prejudicial if the fact was not already obvious from the other evidence presented at trial and would have provided new ammunition against an appellant." *United States v. Barker*, 77 M.J. 377, 384 (C.A.A.F. 2018) (citing *Harrow*, 65 M.J. at 200).

---

[13] Citing *Hukill*, 76 M.J. at 222, and *Hills*, 75 M.J. at 357, Appellant urges us to apply the harmless beyond a reasonable doubt standard to test for prejudice because the military judge committed constitutional error. We decline to apply the more stringent standard. Because the military judge did not use the charged conduct as propensity evidence under Mil. R. Evid. 413, there are no "constitutional dimensions at play." *Hukill*, 76 M.J. at 222 (citation omitted).

**1. Conviction of Specification 3—Abusive Sexual Contact of Mr. STK**

As to Specification 3, we conclude the erroneous Mil. R. Evid. 404(b) ruling did not have a substantial influence on Appellant's conviction.[14] The Government's case for Specification 3 was very strong without the evidence underlying Specifications 4 and 5. The testimony of Mr. STK provided convincing proof of all the elements of the abusive sexual contact offense. It was supported by Appellant's admission when he was confronted by his friends. The Government's case was also supported by Appellant's common plan or scheme to secretively engage in sexual contact with SSgt RW and SSgt SAK with the specific intent to gratify Appellant's sexual desire, as shown by SSgt RW and SSgt SAK's testimony.

The Defense largely conceded that Appellant touched Mr. STK on his genitalia but sought to minimize Appellant's specific intent by characterizing his conduct as a prank. The "prank" argument was a weak one as the circumstances of Appellant touching Mr. STK's genitalia were not the typical circumstances of a "ball tap" joke.

As to *Harrow* factors (3) and (4), the materiality and quality of the evidence for Specifications 4 and 5 was low because Appellant's acts were dissimilar, even if the military judge erred in finding a common plan or scheme. Further, questions about consent and mistake of fact as to consent that permeated the Defense case against Specifications 4 and 5 were not present in litigating Specification 3.

Collectively, the evidence of Specifications 1, 2, and 3 could properly be used pursuant to Mil. R. Evid. 404(b) for Specifications 1, 2, and 3. Considering the four *Harrow* factors together, we conclude that the admission of evidence of sexual conduct underlying Specifications 4 and 5 to prove Specification 3 did not have a substantial influence on the finding or materially prejudice Appellant's substantial rights. Accordingly, we find the error to be harmless.

---

[14] Because we find the evidence of Specification 1 factually insufficient and because Appellant was acquitted of Specification 2, we consider the erroneous admission of Appellant's acts with SrA JD only as they may affect the finding of guilty of Specification 3.

**2. Conviction of Specifications 4 and 5—Abusive Sexual Contact and Sexual Assault of SrA JD**

As to Specifications 4 and 5, we conclude the erroneous ruling did not have a substantial influence on Appellant's convictions of these offenses. The testimony of SrA JD established convincing proof of all the elements of the abusive sexual contact and sexual assault offenses involving SrA JD. The Government's case was also supported by Appellant's admission taking "full responsibility" for what happened. The Defense largely conceded that Appellant engaged in sexual conduct with SrA JD but sought to show that either SrA JD consented or that Appellant labored under an honest and reasonable mistake of fact as to consent. The cross-examination of SrA JD challenged his claim of lack of consent and tried to bolster Appellant's mistake of fact as to consent. Because the critical issue was not whether Appellant engaged in the charged acts or, for Specification 4, whether Appellant intended to gratify his sexual desire, the erroneous admission of plan or scheme evidence of Specifications 1–3 was not dispositive for the findings on Specifications 4–5. With respect to the materiality and quality of the evidence of acts underlying Specifications 1–3, they, again, were dissimilar, even if the military judge erred in finding a common plan or scheme, and thus not logically material to the Government's proof on Specifications 4–5. The evidence of Appellant's intent to gratify his sexual desire underlying Specifications 1–3 was of little consequence to litigation of consent and mistake of fact in Specifications 4–5.

Considering the four *Harrow* factors together, we conclude that the admission of evidence of sexual conduct underlying Specifications 1–3 to prove Specifications 4 and 5 did not have a substantial influence on the findings or materially prejudice Appellant's substantial rights. Accordingly, we find the error to be harmless.

**D. Referral of Specification 5**

Appellant alleges that the military judge who presided at his trial erred in denying Appellant's motion to dismiss Specifications 1, 2, and 5 because the staff judge advocate (SJA) improperly advised the convening authority that the specifications were warranted by the evidence contrary to the determination made by the PHO who conducted the Article 32, UCMJ, 10 U.S.C. § 832, preliminary hearing. Because we find the evidence of Specification 1 factually insufficient and Appellant was acquitted of Specification 2, we address Appellant's assignment of error only as it affects Specification 5.

**1. Procedural Background**

The PHO found no probable cause and recommended Specification 5 not be referred to trial. The special court-martial convening authority disagreed and forwarded the specification to the general court-martial convening au-

thority (GCMCA) with the recommendation that it be referred. The pretrial advice of the SJA stated that Specification 5 was warranted by the evidence and recommended referral. The GCMCA followed his SJA's advice and ordered Specification 5 be referred to trial.

### 2. Analysis

Appellant asserts that when a PHO determines there is no probable cause, the specification cannot be warranted by the evidence and cannot be referred to trial. We disagree. Were we to follow Appellant's logic to its conclusion, a PHO's determination of no probable cause would bind and diminish the role of the GCMCA and moot the independence of the SJA who may disagree with the PHO's determinations and recommendations.

We agree with the Government that the PHO's recommendation, to include the probable cause determination, is not binding on the SJA or GCMCA. *See also* R.C.M. 405(a), Discussion ("Determinations and recommendations of the preliminary hearing officer are advisory."). We conclude that Appellant's substantial rights were not prejudiced by the manner in which Specification 5 was referred to trial by court-martial.

## E. Evidence of Messages Between Appellant and SrA JD

Appellant asserts that the military judge erred when he refused to admit text messages between Appellant and SrA JD. Over Defense objection, the military judge admitted a message Appellant sent to SrA JD in September 2014, in which Appellant stated he took "full responsibility" for what happened the night of the alleged sexual assault. The Defense moved to admit subsequent messages in the same message thread arguing that they were part of the same conversation or statement. These messages, initiated by SrA JD with the assistance of an AFOSI agent, were exchanged between Appellant and SrA JD about 20 months later in May 2016, and they continued the discussion of what happened in August 2014. Appellant argues on appeal, as he did at trial, that the subsequent messages show that Appellant apologized because he believed both he and SrA JD made mistakes that night while they were drunk and that Appellant did not believe he had done anything against SrA JD's will.

We review a military judge's ruling on the admissibility of evidence for an abuse of discretion. *United States v. Johnson*, 46 M.J. 8, 10 (C.A.A.F. 1997). In *United States v. Rodriguez*, the CAAF determined that a subsequent statement made at a different time and place and to a different set of persons is a "discrete, complete event" and is not admissible under the rule of completeness to rebut, explain, or modify the content of an earlier statement if it was "not part of the same transaction or course of action." 56 M.J. 336, 342 (C.A.A.F. 2002). In *Rodriguez*, the CAAF held that the military judge did not

err in excluding the appellant's subsequent statements to law enforcement provided one day after the statements admitted by the Government, even though the statements all related to the same topic: the death of the appellant's wife. *Id.* at 338–39, 342. Here, Appellant's subsequent statements occurred 20 months after Appellant's original message to SrA JD and after Appellant's transfer to a new duty station without any intervening contact between the two. Like *Rodriguez*, the subsequent messages here were exchanged at a different time and at a different place. The continuation of a previous message thread using the same messaging application does not make the new messages part of the same conversation, or statement, as one made many months prior.

We find that the messages Appellant sought to admit were discrete and complete events unto themselves owing to the very significant passage of time and therefore were not part of the same transaction or course of action as his message taking "full responsibility." We find the military judge did not abuse his discretion in either admitting Appellant's admission to SrA JD or excluding the subsequent messages Appellant sent some 20 months later.

**F. Sentence Reassessment**

Because we set aside and dismiss Specification 1 of the Charge, we next consider whether we can reassess the sentence. We have "broad discretion" when reassessing sentences. *United States v. Winckelmann*, 73 M.J. 11, 13 (C.A.A.F. 2013) (citation omitted). The CAAF has repeatedly held that if we "can determine to [our] satisfaction that, absent any error, the sentence adjudged would have been of at least a certain severity, then a sentence of that severity or less will be free of the prejudicial effects of error . . . ." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986). Thus, our analysis is based on a totality of the circumstances with the following as illustrative factors: dramatic changes in the penalty landscape and exposure, the forum, whether the remaining offenses capture the gravamen of the criminal conduct, whether significant or aggravating circumstances remain admissible and relevant, and whether the remaining offenses are of the type that we as appellate judges should have the experience and familiarity with to reliably determine what sentence would have been imposed at trial. *Winckelmann*, 73 M.J. at 15–16 (citations omitted). We find the factors weigh in favor of reassessment rather than rehearing.

We can reliably determine Appellant would have received a sentence of at least a dishonorable discharge, confinement for six years, forfeiture of all pay and allowances, and reduction to the grade of E-1. We are mindful there has been a change in the sentencing posture of this case, with three victims and three convictions of abusive sexual contact reduced to two and the maximum sentence to confinement reduced from 51 to 44 years. Appellant's conviction

for sexual assault remains the most serious offense of which Appellant was found guilty. While the dismissal of Specification 1 of the Charge creates a moderate difference in what would be an appropriate punishment, the remaining offenses of abusive sexual contact of Mr. STK and SrA JD and sexual assault of SrA JD are of the type that we have experience and familiarity with as appellate judges to determine the sentence that would have been imposed.

We also conclude that the reassessed sentence is appropriate. We assess sentence appropriateness by considering Appellant, the nature and seriousness of the offenses, Appellant's record of service, and all matters contained in the record of trial. *United States v. Bare*, 63 M.J. 707, 714 (A.F. Ct. Crim. App. 2006) (citing *United States v. Healy*, 26 M.J. 394, 395–96 (C.M.A 1988); *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982)). We are convinced that the reassessed sentence is not inappropriately severe.

## G. Post-Trial Delay

We note that 131 days elapsed between Appellant's sentencing and the convening authority's action. Although this 11-day delay is presumptively unreasonable, Appellant asserts no prejudice and we discern none. *See United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006) (establishing presumption of unreasonable delay where the convening authority does not take action within 120 days of the completion of trial). Accordingly, we find no violation of Appellant's due process right to timely post-trial processing and appeal. *Id.* at 136. The delay was not so egregious as to undermine the appearance of fairness in Appellant's case and the integrity of our military justice system. *See United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Nevertheless, recognizing our authority under Article 66(c), UCMJ, 10 U.S.C. § 866(c), we considered whether relief for post-trial delay is appropriate in this case even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002) ("Appellate relief under Article 66(c) should be viewed as the last recourse to vindicate, where appropriate, an appellant's right to timely post-trial processing and appellate review."). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), we find it is not.

### III. CONCLUSION

The finding of guilty of Specification 1 of the Charge is **SET ASIDE** and Specification 1 of the Charge is **DISMISSED WITH PREJUDICE**. We reassess the sentence to a dishonorable discharge, confinement for six years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The remaining findings and the sentence as reassessed are correct in law and fact,

and no other error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the remaining findings and the sentence as reassessed are **AFFIRMED.**[15]

HUYGEN, Judge (concurring in the result in part and dissenting in part):

I agree with my esteemed colleagues in the majority that the military judge erred by admitting for a Mil. R. Evid. 404(b) purpose the evidence of Specifications 1, 2, and 3 as a common plan or scheme to find Appellant guilty of Specifications 4 and 5. However, I respectfully dissent with regard to that error's harm for Specification 5 and, correspondingly, the factual sufficiency of Appellant's conviction of sexual assault of SrA JD.

The majority finds that the error was harmless with regard to Specification 4 because the evidence of Specifications 1–3 as a common plan or scheme did not have a substantial influence on Appellant's conviction for abusive sexual contact of SrA JD; I concur.[16] Nonetheless, I must distinguish SrA JD's actual testimony about the incident from the majority's succinct description of it.

At trial, SrA JD testified as follows:

---

[15] The military judge ordered sealed pages 173–86 of the transcript, which was a closed Mil. R. Evid. 412 hearing; however, those pages were not sealed. We direct the Government seal those pages in the original record of trial. We further direct the Government ensure that every paper copy of those pages is retrieved and destroyed, and every electronic copy is destroyed.

[16] I also concur with the majority that the current state of the law is to analyze Mil. R. Evid. 404(b) error as nonconstitutional error and apply the four-factor test of *United States v. Harrow*, 65 M.J. 190, 200 (C.A.A.F. 2007), but I question whether that will remain the state of the law. In Appellant's case, Mil. R. Evid. 404(b) presents the same problem as Mil. R. Evid. 413 prior to *United States v. Hills*, 75 M.J. 350 (C.A.A.F. 2016), and *United States v. Hukill*, 76 M.J. 219 (C.A.A.F. 2017): the factfinder is tasked first to apply a preponderance of the evidence standard to charged conduct of similar crimes in a sexual offense case and then to apply a standard of beyond a reasonable doubt to the same charged conduct. The Court of Appeals for the Armed Forces in *Hills* could have been talking about Appellant's case and Mil. R. Evid. 404(b) when it wrote, "While [a Mil. R. Evid. 413] error . . . is usually nonconstitutional in nature, here, the error involved using charged misconduct . . . and violated Appellant's presumption of innocence and right to have all findings made clearly beyond a reasonable doubt, resulting in constitutional error." *Id.* at 356 (citation omitted).

> He [Appellant] gets into the bed and I remember him roll-
> ing towards me to face me and asking me if I'd ever wanted to
> experiment with guys, or if I'd ever thought about messing
> around with other guys, to which I responded, you know, no,
> man. I just want to go to sleep. . . . He continued questioning,
> and it was at that point he reached his hand out and grabbed
> my penis over my pants and began to massage it. And while he
> was doing that, he continued to sort of ask me, you know,
> you've never thought about it before, you know, are you sure?
> Like he kept pleading to, you know, get me to change my mind
> to which I continued saying, you know, no, man, I just want to
> go to sleep.

As the Defense pointed out at trial, SrA JD's "no" was not specifically and directly a "no" to the sexual contact, before or while it was taking place.[17] Instead, it was a specific and direct answer that no, SrA JD had not previously wanted to engage in or thought about sexual experimentation with another male. I still concur with the majority's decision to affirm the guilty finding of Specification 4. The most important facts and circumstances of the contact charged in Specification 4—namely, that Appellant knew SrA JD was awake and had a verbal exchange with him about sexual experimentation before touching him—were sufficiently different from those of the contact incidents charged in Specifications 1, 2, and 3, all of which involved the alleged victim being asleep or unaware, to conclude the evidence of Specifications 1, 2, and 3 did not have a substantial influence on the finding of Specification 4. Moreover, SrA JD's "no," combined with his immediate follow-on statement of "I just want to go to sleep," made clear to Appellant that, at that moment, SrA JD wanted to sleep. This manifestation of lack of consent made it unreasonable for Appellant to believe SrA JD consented to Appellant's contemporaneous touching of SrA JD's genitalia.

I cannot apply the same reasoning to the guilty finding of Specification 5. Considering the four factors of *Harrow*, I find the Government's case for Specification 5 had a glaring weakness: SrA JD had no memory of the period of time during which he went from being clothed to being naked, from having his head at the head of the bed to having his feet there, or from lying on his back to facing downward and holding his head over Appellant's groin while Appellant's lotion-coated penis first moved in and out of his mouth. The De-

---

[17] Despite trial counsel's attempts to the contrary, SrA JD was clear: he never said "stop."

fense's case was strong in that SrA JD did not remember Appellant holding SrA JD's head during the oral penetration or restraining him during the anal penetration. But SrA JD did remember that he did nothing to resist, verbally or physically, the oral penetration, Appellant's re-positioning of his body, or the anal penetration and that, as soon as he winced and may have made a "vocal expression of pain," Appellant stopped the anal penetration. At that point, not only did Appellant stop and roll SrA JD or allow SrA JD to roll off of Appellant, but he acknowledged SrA JD's reaction to the anal penetration and said he would "just finish the rest" himself.

Considering the third and fourth *Harrow* factors, I find the evidence of Specifications 1–3 immaterial and of low quality as evidence of Specification 5. This finding is premised on the charging theory the Government chose for Specification 5, which was charged as bodily harm, or the alleged act being nonconsensual, and not as the alleged victim being asleep or unaware, which was the Government's charging theory of Specifications 1–3. But I note that the difference is one of charging and not of key fact. The evidence was that SrA JD, the alleged victim in Specification 5, remembered nothing between the ongoing sexual contact and the ongoing oral penetration and thus was arguably unaware at the time the sexual assault began, as the alleged victims of Specifications 1–3 were asleep or unaware at the time the sexual contact began. Despite the obvious difference in charging theories, the military judge found a common plan or scheme between Specifications 1–3 and Specification 5, and that finding leads me to conclude the evidence of Specifications 1–3 substantially influenced the judge's verdict on Specification 5. Thus, the judge's error to admit, for a Mil. R. Evid. 404(b) purpose, the evidence of Specifications 1–3 for Specification 5 was not harmless.

I also dissent from the majority's conclusion that the guilty finding for Specification 5 is factually sufficient. Even if I assume arguendo the Government proved beyond a reasonable doubt that SrA JD did not consent to either the oral or the anal penetration, I cannot agree that the Government met its burden and proved beyond a reasonable doubt that Appellant did not have an honest and reasonable belief SrA JD consented to both.

There is no basis to presume that a man who has a girlfriend or who has not previously engaged in male-male sexual activity or who, when sober, would not consent to male-male sexual activity would never consent to such activity when drunk. The record indicates all of those presumptions were implicated in the Government's case with regard to not only the question of SrA JD's consent but also the question of Appellant's mistake of fact about SrA JD's consent, specifically, whether the mistake was reasonable.

SrA JD did nothing to physically resist or avoid Appellant's repeated contact of SrA JD's genitalia. SrA JD did answer the question of whether he had

"ever thought about messing around with other guys" with the disjointed an-swer of "no, man, I just want to go to sleep." While SrA JD had no memory of what SrA JD (or Appellant) did next, the evidence is clear that some period of time elapsed during which SrA JD went from being clothed, positioned with his head at the head of the bed, and lying on his back to being naked with his clothes on the floor on the side of the bed where he slept, having his feet at the head of the bed, and facing down, holding his head over Appellant's na-ked groin while Appellant's lotion-coated penis moved in and out of his mouth. The only manifestation of non-consent was SrA JD's ambiguous "no" before and during the touching of his genitalia. There was a break in time long enough for SrA JD and Appellant's state of clothing and physical posi-tions to undergo complete transformation. By the end of that break in time, the manifestations of consent, particularly SrA JD holding up his own head after the oral penetration began, support Appellant's honest and reasonable belief that SrA JD was consenting to the oral penetration. Similarly, SrA JD's apparent acquiescence to Appellant moving him and then penetrating his anus were manifestations of consent that support Appellant's honest and rea-sonable belief that SrA JD consented to the anal penetration. Finally, that Appellant stopped the anal penetration when SrA JD winced demonstrates that Appellant was willing to stop at the first indication SrA JD was uncom-fortable and is evidence that Appellant believed SrA JD consented to the anal penetration.

Applying the test for factual sufficiency, I am not convinced beyond a rea-sonable doubt of Appellant's guilt on Specification 5. The majority considers it significant that Appellant sent a message to SrA JD in which Appellant accepted "full responsibility" for the sexual activity with SrA JD; I do not. The message was the last of several Appellant sent to SrA JD to discuss what happened, none of which SrA JD responded to and none of which referred to the sexual activity as occurring against SrA JD's will. Accepting responsibil-ity for sexual activity is not confessing to sexual assault, and Appellant's message doing the former cannot be read as doing the latter.

The majority also considers "Appellant's conduct with SrA JD, charged as two discrete offenses" as "a continuous course of conduct" and thus applies SrA JD's answer of "no, man, I just want to go to sleep" before and during the touching of his genitalia to the later oral and anal penetration. I do not and, because of the break in time and significant change in circumstances during that time, cannot. For all of the reasons articulated, I am not persuaded the

Government proved beyond a reasonable doubt that Appellant did not honestly and reasonably believe SrA JD consented to the oral and anal penetration.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court